UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

|
|
MICHIGAN PROTECTION AND ADVOCACY            |        Case No. 5:05-CV-128
SERVICE, INC.,                                                      |
                                                                            |
        Plaintiff,                                                      |        HONORABLE PAUL MALONEY
                                                                            |
                v.                                                         |
                                                                            |
PATRICIA L. CARUSO, in her official capacity as    |
Director, Michigan Department of Corrections,        |
                                                                            |
        Defendant.                                                   |
                                                                            |
_____

**Opinion and Order**

**Granting Defendant's Motion for Summary Judgment to Defendant on State-Law Claim;
Denying Plaintiff's Motion for Summary Judgment on State-Law Claim**

This is a civil-rights action under 42 U.S.C. § 1983.  Plaintiff Michigan Protection and

Advocacy Service, Inc. ("MPAS") is a private non-profit entity that is statutorily authorized "to

monitor facilities and programs that house individuals with mental illnesses and developmental

disabilities, to investigate suspected incidents of abuse and neglect, and to pursue administrative,

legal, and other remedies on behalf of [such] individuals . . . wherever programs for such individuals

are operated within the State of Michigan . . . ."  *See* Third Amended Complaint filed Nov. 20, 2006

("Comp") ¶¶ 9-10.  MPAS challenges the conditions under which the defendant Michigan

Department of Corrections ("MDOC") confined certain mentally ill and disabled prisoners who are

under the age of 27 ("prisoners").  This challenge centers on but is not limited to the Michigan Youth Correctional Facility ("MYCF") in Lake County, which operated as a maximum-security ("Level V") prison from July 1999 until its closure in October 2005,[1] housing about 480 male prisoners between the age of 14 and 19 who were convicted and sentenced as adults.  *See* Comp ¶¶ 2, 9-11, and 23.

In particular, MPAS challenges MDOC's alleged use of isolation and its failure to provide adequate mental-health and educational services, both of which it contends violates the prisoners' Eighth Amendment right to be free from cruel and unusual punishment and their rights under three federal statutes:   the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), the Rehabilitation Act of 1974 section 504 as codified at 29 U.S.C. § 794 ("the Rehab Act"), and the Individuals with Disabilities Education Act, 20 U.S.C. § 1401 *et seq.* ("IDEA").  *See* Comp ¶¶ 1, 4, 525, 528-29.  MPAS also contends that MDOC violates prisoners' Fourteenth Amendment due-process right by imposing "major misconduct" punishments without determining whether the prisoner should be held responsible for his actions, *see* Comp ¶ 527, leading to negative disciplinary records and security designations that followed MYCF prisoners to other facilities, with adverse

---

[1]

According to MPAS,

Until October 2005, male youth under the age of 19 who were committed to the MDOC, after a brief stay at the reception center, were assigned to MYCF, where they generally were held until age 19.  Since October 2005, MDOC has assigned these youth, after a brief stay at the reception center, to other MDOC facilities and has transferred youth who were housed at MYCF in October 2005 to other MDOC facilities.  Female youth sentenced as adults have been and are confined at the Robert Scott Correctional Facility.

Comp. ¶ 26.

consequences, *see* Comp. ¶ 28.  Finally, MPAS alleges that MDOC retaliated against certain prisoners for cooperating with MPAS and participating in this lawsuit, violating their federal constitutional right of access to the courts.  *See* Comp ¶¶ 28 and 530.

MPAS's complaint does not seek compensatory or punitive damages.  Rather, it seeks a declaration that MDOC has violated the Eighth Amendment, the ADA, the IDEA, and the Rehab Act, and a permanent injunction that (1) prohibits MDOC from subjecting mentally ill prisoners to the conditions described, (2) requires MDOC to train its staff to ensure that they do not punish young prisoners for symptoms of their mental illness or developmental disability, (3) requires MDOC to offer adequate special-education and mental-health services to prisoners who have been affected by the challenged practices, (4) requires MDOC to adjust the security status of prisoners affected by the failure to consider the prisoner's disability or mental illness before imposing punishment or a more restrictive or onerous security classification, (5) requires MDOC to adjust the parole eligibility of prisoners who were housed at MDOC, to reflect MYCF's use of administrative segregation and its failure to provide adequate education and mental-health services to such prisoners.  *See* Comp at 87-88 (Prayer for Relief ¶¶ 1-6).  MDOC also seeks attorney fees and costs under a federal civil-rights statute, 42 U.S.C. § 1988.  *See* Comp at 88 (Prayer for Relief ¶ 7).

On January 30, 2008, MPAS moved for partial summary judgment on a single purely legal question.  MPAS seeks a declaration "that students over the age of 22 but under the age of 27 who are in the custody of Defendant are entitled to special education services" under the Michigan Mandatory Special Education Act, MICH. COMP. LAWS §§ 380.1701 - 380.1766 ("the Act"), while MDOC seeks, roughly, a contrary declaration.  MDOC filed an opposition brief on February 29, 2008; MPAS filed a reply brief on March 14, 2008; and with leave of court, the Michigan

Department of Education ("DOE") filed an *amicus curiae* brief in support of MDOC on April 1, 2008.

In August 2008, the parties jointly moved to stay this action for one year while they attempt to agree on changes in the Michigan prison system that may lead to an amicable resolution of MPAS's federal claims. The parties made clear, however, that they did not wish to delay consideration of their cross-motions for summary judgment on the state-law issue. The court entered a stay of the action with the exception of the instant motions. For the reasons that follow, the court will grant summary judgment to MDOC on the state-law issue, and the case will remain stayed on the federal-law issues.

## A Federal Court's Application of State Law

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *14 (W.D. Mich. 2008) (Paul L. Maloney, J.) ("*ARS*") (quoting *National Union Fire Ins. Co. of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Richard Allen Griffin, J.) (citation omitted)). If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts: "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'" *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)). In determining what is the controlling law of the State, a federal court also "*may* give weight" to the decisions of the State's

trial courts, *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975) (citing *Royal Indem. Co. v. Clingan*, 364 F.2d 154 (6th Cir. 1966)), especially when the trial court's decision is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605.

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts. *See Appalachian Railcar Servs., Inc. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *14 (W.D. Mich. Mar. 25, 2008) (Maloney, J.) ("*ARS*") (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision *(Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")). If a state court would not be bound by a particular state-court decision, then neither is this court. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.")) (citation omitted).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis." This subsection makes no distinction based on when the decision was issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule."  Emphasis added.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14.

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to all of its prior published decisions, regardless of when they were issued.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14.  When a post-November 1, 1990 published Court of Appeals decision conflicts with a pre-November 1, 1990 published Court of Appeals decision, however, the post-November 1, 1990 decision prevails.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14.

When there is a conflict between two published decisions of the Court of Appeals that were both issued after November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by unpublished decisions of that same court, regardless of when they were issued.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Iqbal v. Bristol West Ins. Group*, – N.W.2d –, –, 2008 WL 398881, *__ (Mich. App. Feb. 14, 2008) (citing MICH. CT. R. 7.215(C)(1))).

Finally, a federal court's interpretation of state law is not binding.  *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court)

on a question of state law is not binding on state tribunals . . . .")).  Accordingly, this court will seriously and respectfully consider our Circuit's interpretation of state law but is not bound by it. *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15.

# Analysis

### MDOC Contends that the Act Does Not Apply to Prisons

Undisputed Material Facts.  MPAS states that the following material facts are undisputed: there are inmates in MDOC's custody who qualify for special-education services; MDOC terminates special-education services when an inmate reaches age 22; and there are inmates over the age of 22 but under the age of 27 who continue to qualify for special education services.  MSJ at 2.

MDOC agrees, with one exception.  MDOC correctly notes that age 27 is not the cut-off for special-education services under the MMSEA.  As MDOC notes, "Michigan law provides for special education for persons with certain impairments only through age *25*, but if a student turns *26* during the school year, the special education continues until the end of that school year."  MDOC's Opp'n at 2 (citing MAC Rule 340.1702).  In other words, the MMSEA's cut-off age for state-taxpayer-funded special education services is sometimes 25 and sometimes 26 years old, depending on when the student's birthday falls in relation to the school year.

The parties agree that the cut-off for special education services under federal law is age 22, i.e., that MDOC inmates aged 22 and older are not entitled to special education services unless state law (such as the MMSEA) accords them that right.

The Parties' Arguments.  MPAS contends that the Act requires MDOC to provide special education services to inmates "over the age of 22 but under the age of 27", and that there are

approximately 77 inmates within that age range who seem to qualify for those services.  MSJ at 2-3.

MPAS points to MICH. ADMIN. CODE R. 340.1702, which defines "student with a disability" as

> a person who is determined by an individual education program team or a hearing officer to have 1 or more of the impairments specified in this part that necessitates special education or related services, or both, who is not more than 25 years of age as of September 1 of the school year of enrollment, who has not completed a normal course of study, and who has not graduated from high school.  A student who reaches the age of 26 years after September 1 is a 'student with a disability' and entitled to continue a special education program or service until the end of that school year.

MPAS contends that MDOC is bound by the Act because it fits Michigan law's broad definition of

a "public agency."  Michigan Administrative Code Rule 340.1701 today provides,

> All public agencies in the state, *as those agencies are defined at 34 C.F.R. § 300.22* of the regulations implementing the Individuals with Disabilities Education Act, 20 U.S.C. chapter 33, § 1400 *et seq.*, shall comply with these rules;

> all provisions of the state's application for federal funds under part B of the [IDEA];

> the requirements of part B of the [IDEA];

> and the regulations implementing the [IDEA], which are adopted by reference in these rules.

Emphasis and paragraph breaks added.


June 6, 2002 through the Present

**MAC Rule 340.1701 expressly adopts by reference the definition of "public agency" set forth at 34 C.F.R. § 300.22.**  As the Michigan Supreme Court has held, statutes that incorporate *existing* federal statutes by reference are valid and constitutional.  *Radecki v. Dir. of Bureau of Worker's Disability Compensation*, 526 N.W.2d 611, 613 (Mich. App. 1994) (citing *Pleasant Ridge v. Gov. George Romney*, 169 N.W.2d 625, 630-32 (Mich. 1969) and *People v. Urban*, 206 N.W.2d

511, (Mich. App. 1973)).  *See, e.g., Parker, Webb & Co. v. Austin*, 121 N.W. 322 (Mich. 1909); *McGeorge v. Walker*, 31 N.W. 601 (Mich. 1887) (incorporating federal standards for weights and measures);

But State legislation that adopts by reference "*future* legislation, rules, or regulations, or amendments thereof, which are enacted, adopted, or promulgated by another sovereign entity, constitutes an unlawful delegation of legislative power." *Radecki*, 526 N.W.2d at 613 (emphasis added) (citing, *inter alia, Lievense v. Unemployment Comp. Comm'n*, 55 N.W.2d 857 (Mich. 1952) and *Dearborn Independent, Inc. v. Dearborn*, 49 N.W.2d 370 (Mich. 1951)).[2]  To the extent that a Michigan statute purported to incorporate a future enactment of another sovereign entity, the statute

---

[2]

The Michigan Legislature may, however, enact a statute providing that a *decision or determination* by another sovereign entity, such as a federal agency, will have a specified effect under state law.  In *Taylor v. SmithKline Beechum Corp.*, 468 U.S. 1 (2003), the Michigan Supreme Court addressed a state statute that limited the liability of drug manufacturers and sellers if the drug at issue and its labeling were in compliance with the federal Food and Drug Administration (FDA)'s standards.  Addressing the argument that the statute represented an unconstitutional delegation of legislative power, the Supreme Court wrote:

> The Court of Appeals also cited *Radecki* . . . .  In *Radecki*, the Court of Appeals considered a state statute that incorporated by reference a federal statute.  The Court said that state statutes may incorporate by reference existing federal statutes, but not future legislation.  Utilizing its "no change" argument, the Court characterized M.C.L. § 600.2946(5) as an impermissible "reference statute" that incorporates future standards promulgated by the FDA.  We disagree.  First, M.C.L. § 600.2946(5) is not a "reference statute" as that phrase is used, which is to mean incorporation into Michigan law of a standard from a different jurisdiction as a rule of law to be applied in Michigan courts.  Rather, it provides that certain legal consequences flow from factual determinations made by the FDA and is not a delegation.  Accordingly, *Radecki*, whatever its merits as law, is not relevant to a consideration of whether M.C.L. § 600.2946(5) is an impermissible delegation of legislative power.

*Id.* at 16-17.  Such a statute is not at issue here.  The Michigan act at issue here is a true "reference statute."

would be invalid, though the remainder of the statute would be severable and remain valid. *See People v. DaSilva*, 189 N.W.2d 362, 365 (Mich. App. 1971).

This constitutional distinction compels the rule that when a Michigan statute, regulation, or rule incorporates by reference a named federal statute, regulation, or rule, the Michigan authority forever incorporates only the version of the incorporated federal authority that existed *on the date the Michigan statute was enacted*.

> When a Michigan statute adopts by reference a federal law that is subsequently amended, but the Michigan statute remains unchanged, the courts are constitutionally required to construe the statute as continuing to refer to the original federal enactment before amendment. By failing to amend the Michigan statute, the Legislature is presumed to have intended to freeze the federal law as it was at the time of the original state statute.

*Radecki*, 526 N.W.2d at 614 (citing *Urban*, 206 N.W.2d at 517); *see also DaSilva*, 189 N.W.2d at 364-65.

In *Jager v. Rostagno Trucking Co., Inc.*, 728 N.W.2d 467 (Mich. App. 2006), *app. denied*, 729 N.W.2d 512 (Mich. 2007), for instance, the Court of Appeals had to interpret a Michigan statutory provision that incorporated by reference the definition of "employment in the logging industry" found in the section of the Workmen's Compensation and Employers Liability Insurance Manual entitled "logging or lumbering drivers code no. 2702." The Court of Appeals held that

> the Legislature intended the version of the manual referred to in [the statute], including the code no. 2702 *that was in existence at the time* [the Public Laws enacting the statute] were enacted, to be the standard to determine employment in the logging industry. Any subsequent changes to the definition contained in the manual would not change the statutory definition of "employment in the logging industry."

*Jager*, 728 N.W.2d at 467 (following, as persuasive authority, *Michigan Mfrs. Ass'n v. Workers Disability Comp. Bureau Dir.*, 352 N.W.2d 712, 714-15 (Mich. App. 1984)). *See also, e.g., Radecki*,

526 N.W.2d at 614 ("We conclude that, by failing to amend the Workers' Disability Compensation Act to incorporate the 1986 federal tax reforms, the Legislature intended the Act to continue to refer to the pre-1986 Internal Revenue Code."); *Urban*, 206 N.W.2d at 516 ("Thus, M.C.L.A. § 335.106 . . . cannot be construed to refer to the 1968 or 1970-1971 version of the [federal] Act, since these laws were enacted after the date on which the Michigan statute was passed by the Legislature.").

Moreover, Michigan's Administrative Procedures Act ("APA") provides that

> *An agency may adopt, by reference in its rules* and without publishing the adopted matter in full, *all or any part of a code, standard or regulation which has been adopted by an agency of the United States* or by a nationally recognized organization or association.  The reference shall fully identify the adopted matter by date and otherwise.  *The reference shall not cover any later amendments and editions of the adopted matter,* but if the agency wishes to incorporate them in its rule it shall amend the rule or promulgate a new rule therefor.

M.C.L. § 24.232(4) (emphasis added), quoted by *Martin v. DOC*, 384 N.W.2d 392, 393 n.3 (Mich. 1986).

Accordingly, the court holds that each version of MAC Rule 340.1701 incorporates only the definition of "public agencies" that was found in 34 C.F.R. § 300.22 at the time that particular version of the rule was enacted, without any subsequent amendments to the federal provision.

**Which versions of MAC Rule 340.1701 apply here?**  MPAS's complaint focuses on MDOC's treatment of certain inmates at the Lake County MYCF, which operated from July 1999 until its closure in October 2005.  Accordingly, the court looks only to the versions of MAC Rule 340.1701 that have been in effect from and including July 1999 to the present.

MAC Rule 340.1701 was amended in 1997 and on June 6, 2002.  The 1997 version did <u>not</u> contain the incorporation of 34 C.F.R. § 300.22's definition of "public agency."  Thus, the version

-11-

of MAC Rule 340.1701 in effect at the beginning of the relevant period (July 1999) was the 1997 version.  It did not incorporate any definition of "public agency."  Here is the version of MAC Rule 340.1701 that was in effect from July 1999 until June 6, 2002:

> R. 340.1701   Definitions: A to E
>
> Rule 1.  As used in these rules:
>
> *  *  *
>
> (b)   "Agency" means a public or private entity or organization, including the local education agency, intermediate school district, the department, and any other political subdivision of the state that is responsible for providing education or services to persons who are disabled.

MAC Rule 340.1701 (retrieved from Michigan Register 1997, Issue No. 3, "Department of Education, State Board of Education, Special Education Programs and Services, Part 1-General Provisions), reproduced at Def. MDOC's Ex. 2.

MAC Rule 340.1701 has not been amended since June 6, 2002.  Thus, the version of MAC Rule 340.1701 in effect from June 6, 2002 to the present is the June 6, 2002 amended version, which added the incorporation of 34 C.F.R. § 300.22's definition of "public agency."  **The court holds, therefore, that from June 6, 2002 to the present, the only entities that are required to comply with Michigan's special-education requirements are those that are "public agencies" as that term was defined by 34 C.F.R. § 300.22 as it stood on June 6, 2002.**

**Was MDOC a "public agency" as defined by 34 C.F.R. § 300.22 as it stood from June 6, 2002 through the present?  The court holds that it was not.**

 Title 34 C.F.R. § 300.22 was last amended March 12, 1999 and August 14, 2006.  Thus, when MAC Rule 340.1701 was amended on June 6, 2002, it *incorporated the March 12, 1999 version* of that federal regulation, which provided:

-12-

> As used in this part, the term public agency includes the SEA [State Education Agency, i.e., the Michigan Department of Education][3], LEAs [Local Education Agencies][4], ESAs, public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA, *and any other political subdivisions of the State that are responsible for providing education to children with disabilities*.

MDOC Opp'n, Ex. 3 (March 12, 1999 version of 34 C.F.R. § 300.22) (emphasis added). Because MAC Rule 340.1701 has not been amended since June 6, 2002, it has never incorporated amendments to the federal regulation that were passed after that date (such as the August 2006 amendment, *see* MDOC Opp'n, Ex 4).

The court analyzes 34 C.F.R. § 300.22's two clauses separately. As for the first clause, it is undisputed that MDOC is not the Michigan Department of Education or an LEA (Local Education Agency). Next, MPAS has not contended that MDOC is an ESA (educational services agency)[5].

---

[3]

The term "State Education Agency" appears four times in the Michigan Compiled Laws:

MICH. COMP. LAWS § 388.164a(11)(c) ("'State education agency' means the Department.");
MICH. COMP. LAWS § 388.1694a(11)(c) ("'State education agency' means the Department.");
MICH. COMP. LAWS § 388.1698(9)(c) ("'State education agency' means the Department.");
MICH. COMP. LAWS § 388.1698(10)(c) ("'State education agency' means the Department.").

[4]

The full term "Local Education Agency" appears only once in the Michigan Compiled Laws. *See* MICH. COMP. LAWS § 3.1041, Interstate Compact on Educational Opportunity for Military Children, Art. II, Definitions, ¶ H ("'Local education agency' means: a public authority legally constituted by the state as an administrative agency to provide control of and direction for Kindergarten through Twelfth (12th) grade public educational institutions.").

[5]

The acronym ESA appears nowhere in the Michigan Compiled Laws.

When the acronym ESA appears in *federal* statutes, it occurs only in non-education contexts: the Endangered Species Act, the Employment Standards Administration, the Economic Stabilization Act, Coverdell Education Savings Accounts, the Energy Security Act, or the Illinois Employment of Strikebreakers Act, and in one instance each in statutes governing National Forests and Transportation, respectively.

Concluding the analysis of 34 C.F.R. § 300.22's first clause, MPAS has not contended that MDOC

is a public charter school.[6]

Therefore, MDOC will not qualify as a public agency under 34 C.F.R. § 300.22 unless it

satisfies the regulation's second clause:  "any other political subdivision[] of the State that [is]

_____

The acronym ESA does appear in a relevant context in federal *regulations*.  Title 34 C.F.R. § 300.2(b)(ii) and 34 C.F.R. Part 300, App. E both equate ESA with educational service agency.  More specifically, title 34 C.F.R. § 300.12 defines ESA as

    (a)    a regional public multiservice agency –

        (1)    Authorized by State law to develop, manage, or provide services or programs to LEAs;

        (2)    Recognized as an administrative agency for purposes of the provision of special education and related services provided within public elementary schools and secondary schools of the State;

    (b)    includes any other public institution or agency having administrative control and direction over a public elementary school or secondary school; and

    (c)    includes entities that meet the definition of intermediate educational unit in section 602(23) of the Act as in effect prior to June 4, 1997.

In turn, 34 C.F.R. § 222.50 defines intermediate educational unit as "any public authority, other than an LEA, that is under the general supervision of a State educational agency, that is established by State law for the purpose of providing free public education on a regional basis, and that provides special education and related services to children with disabilities within that State.

[6]The term "public charter school" appears nowhere in the Michigan Compiled Laws or the Michigan Administrative Code.

The term "charter school" appears nowhere in the Michigan Compiled Laws.  It appears only once in the Michigan Administrative Code, but it is not defined.  *See* Mich. Admin. Code R. 325.1545, DEQ, Drinking Water & Radiological Protection Division, Medical Waste Producing Facilities, "Registration of Multiple Producing Facilities; medical waste management plan content; registrations for school districts; registration fee."

The court has not located any state or federal court decision that defines "public charter school" or "charter school" under Michigan law.

responsible for providing education to children with disabilities."  MPAS fails to show that MDOC is such an entity.

First, MPAS claims that in *Simpson v. UAW Local 6000 and MDOC*, 394 F. Supp.2d 991 (E.D. Mich. 2005) (Zatkoff, U.S.D.J.), a federal district court "noted that MDOC is a '. . . political subdivision of the State of Michigan.'"  MPAS MSJ Reply at 3.  This court must note, with disapproval, that MPAS's quotation from *Simpson* is misleadingly incomplete.  The district court in *Simpson* did <u>not</u> analyze whether MDOC should be considered a political subdivision of the State of Michigan, and it cited <u>no</u> authority, binding or persuasive, for that proposition.  Rather, when one includes the part of the sentence that MPAS conveniently omits, *Simpson* merely stated, <u>without discussion</u>, "*Plaintiff concedes that* MDOC is a political subdivision of the State of Michigan." *Simpson*, 394 F. Supp.2d at 999 (emphasis added).  In our case, by contrast, MDOC does not concede that it is a political subdivision of the State.  Moreover, as a federal court opinion, *Simpson* lacks precedential value in Michigan state courts.  *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")).

Second, MPAS has not identified any Michigan statute or regulation defining MDOC as a political subdivision of the State, whether for purposes of this regulation or generally.  Nor has MPAS identified any Michigan statute or regulation whose language even inferentially suggests that the Legislature considers MDOC to a political subdivision of the State.

**On the contrary, at least one Michigan statute is phrased in a way that suggests that MDOC, *precisely because it is a department of the State*, is therefore <u>not</u> a "subdivision" of the**

-15-

**State.**  Michigan's Elliott-Larsen Civil Rights Act (MELCRA) defines "public service" as

> a public facility, *department, agency*, board, or commission, owned, operated, or *managed by or on behalf of* the state, *a political subdivision*, or an agency thereof or a tax-exempt private agency established to provide service to the public, except that public service does not include . . . .

MICH. COMP. LAWS § 37.2301(b) (emphasis added).[7]  It bears remembering that MDOC is the Michigan *Department* of Corrections.  This is significant, because MELCRA contemplates that departments can be and are owned, operated, and managed by political subdivisions of the State – it would be nonsensical to say that a department that is itself a political subdivision is owned or operated by ... a political subdivision!  The court is not aware of any example of one State of Michigan political subdivision (such as a county or municipality) owning, operating or managing another.

Moreover, under basic principles of statutory construction, the court ascribes significance to the fact that MICH. COMP. LAWS § 37.2301(b) lists "a political subdivision, *or* an agency thereof" in the disjunctive.  For purposes of the MELCRA, at least, the Legislature clearly does not equate a political subdivision with an agency.  Based on the definitional language of MICH. COMP. LAWS § 37.2301(b), MDOC, again the Michigan *Department* of Corrections, might be considered an

---

[7]

Even if MDOC were considered "a political subdivision of the State", MPAS has not shown that MDOC is "responsible for providing education to children with disabilities."  MPAS presents no authority, nor can it, for the notion that in the view of the Michigan Legislature, the *raison d'etre*, the primary intended function, or even a *substantial* intended function of the Michigan prison system is to provide education to children with disabilities.  Federal and state statute may require MDOC to provide education to disabled inmates under the age of majority, but MDOC is obviously not one of the entities whose bailiwick is education.

In this connection, it is useful to remember that the Michigan Mandatory Special Education Act itself is an article of the *School Code*, not a general statute or part of a code governing crime, criminals, or prisons.  *See* MICH. COMP. LAWS §§ 380.1701 - 380.1766.

*agency* of the State, but not a *political subdivision* of the State.[8]

In addition, a Michigan statutory provision entitled Governmental Liability for Negligence defines political subdivision as

> a municipal corporation, county, county road commission, school district, community college district, port district, metropolitan district, or transportation authority or a combination of 2 or more of these when acting jointly; a district or authority authorized by law and formed by 1 or more political subdivisions; or an agency, department, court, board, or council of a political subdivision.

MICH. COMP. LAWS § 691.1401(b). The definition does not include MDOC.

Another statute shows that political subdivisions are entities that are fundamentally different in character from MDOC. A statute governing Conditions of Employment for Public Officers and Employees defines "public employer" as "a county, township, village, city, authority, school district *or other political subdivision of this state* and includes any entity jointly created by 2 or more public employers." MICH. COMP. LAWS § 15.601(a) (emphasis added).

Finally, the Michigan Supreme Court views agencies of the State as distinct and different from political subdivisions of the State, and it has no doubt which one MDOC is. In *Dearden v. City*

---

[8]

Other statutory provisions likewise distinguish between a state agency and a political subdivision of the State by listing them in the disjunctive:

MICH. COMP. LAWS § 423.501(2)(b) (Bullard-Plawecki Act) (defining "employer" to include ". . . the state or any agency *or* a political subdivision of the state . . . .") (emphasis added);

MICH. COMP. LAWS § 37.2103(g) (Civil Rights Act) (defining "person" to include "the state or a political subdivision of the state *or* an agency of the state . . . .") (emphasis added).

*Cf. People v. Williams*, 664 N.W.2d 811, 815 (Mich. App. 2003) ("As Justice Boyle observed, *the Legislature's use of the disjunctive 'or'* 'suggests strongly that open exposure and indecent exposure are distinctly different kinds of behavior and that the Michigan Legislature understood each to define different conduct.'") (quoting *In re Certified Question*, 359 N.W.2d 513, 518 (Mich. 1984)) (emphasis added).

*of Detroit*, 269 N.W.2d 139 (Mich. 1978) (Ryan, J., for a unanimous Court, with Moody, J., not participating), the Supreme Court stated, "We are asked in this case to decide whether *the Department of Corrections, an agency of the State,* is immune from, or subject to, the local zoning ordinance of the City of Detroit, a political subdivision of the State." *Id.* at 140.

On the basis of these authorities, and lacking any contrary authority from MPAS, the court determines that the Michigan Supreme Court would not consider MDOC a political subdivision of the State for this purpose. That means that MDOC was not a "public agency" for purposes of MAC Rule 340.1701 (incorporating March 12, 1999 version of 34 C.F.R. § 300.22) from June 6, 2002 to the present. Thus, during that period, the MMSEA did not require MDOC to provide special-education services to its adult inmates beyond that required by federal law. **For this reason, MDOC is entitled to summary judgment on the MMSEA claim as to the period from June 6, 2002 through the present.**

<u>1999 through June 5, 2002</u>

**The court next considers whether the MMSEA obligated MDOC to provide special-education services to its adult inmates, beyond those required by federal law, from July 1, 1999 through June 5, 2002. The court ultimately concludes that MPAS fails to provide any applicable definition of agency or public agency that would bring MDOC within the purview of the MMSEA for this earlier period, either.** As discussed above, before June 6, 2002, MAC Rule 340.1701 did not incorporate 34 C.F.R. § 300.22's definition of "public agency." The court must look elsewhere in Michigan law, then – preferably, but not necessarily, Michigan *education* law – to find a suitable definition of "agency" or "public agency" for the period before June 6, 2002.

Plaintiff MPAS points to a federal regulation, 34 C.F.R. § 300.2. That regulation, entitled

Public Agencies within the State, provides, in pertinent part,

> (a)    States.  This part applies to each State that receives payments under Part B of the Act, as defined in § 300.4.
>
> (b)    *Public agencies within the State.  The provisions of this part –*
>
>> (1)    *apply to all political subdivisions of the State that are involved in the education of children with disabilities, including*:
>>
>>> (I)    The State educational agency (SEA).
>>>
>>> (ii)    Local educational agencies (LEAs), educational service agencies (ESAs), and public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA.
>>>
>>> (iii)    Other State agencies and schools (such as Departments of Mental Health and Welfare and State schools for children with deafness or children with blindness).
>>>
>>> (iv)    *State and local juvenile and adult correctional facilities*. . . .
>>
>> (2)    Are binding on each public agency in the State that provides special education and related services to children with disabilities, regardless of whether that agency is receiving funds under Part B of the Act.

34 C.F.R. § 300.2(a) and (b) (emphasis added).  MPAS argues that because federal education regulations specifically include state adult correctional facilities in the definition of public agencies, and because state regulations *refer to* those federal regulations, "it is apparent that the State of Michigan has intended to include state adult correctional facilities as public agencies subject to the provisions of state law with respect to the delivery of special education services."  MPAS MSJ at 6.

The court finds this argument unpersuasive.  MPAS fails to identify any Michigan statute or administrative rule that incorporated 34 C.F.R. § 300.2 by reference during the period from the facility's opening in 1999 through June 5, 2002.  Therefore, MPAS provides no basis for this court to read 34 C.F.R. § 300.2 into Michigan law.[9]

MPAS next argues that when the Michigan Legislature wished to exempt MDOC from an act's requirements, it knew how to do so and did so explicitly.  MPAS contrasts the Act – which does not expressly exempt MDOC from its coverage – with the Michigan Persons with Disabilities Civil Rights Act, MICH. COMP. LAWS § 37.1301(b), and the Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS §37.2301(b) ("MELCRA"), both of which expressly exempt MDOC.  This argument rests on the rationale of construction, that the Legislature's exemption or exclusion of an entity or thing in some instances can make its failure to exempt or exclude significant in other instances.  *See* MPAS MSJ at 6 and MPAS Reply at 2.  Moreover, MPAS notes, MICH. COMP. LAWS § 380.1751(5) requires state government departments to operate special-education programs, and it does not exempt MDOC.  But this indirect argument by inference still begs the question, is there any affirmative Michigan statutory or regulatory authority that *includes* or *specifies* the prison system as subject to the special-education requirement, in the absence of some definition of "agency" or "public agency" that would bring MDOC within the MMSEA's purview?  MPAS has not identified such authority.  The mere fact that some statutes exclude MDOC but the MMSEA does not, is a

---

[9]

Accordingly, the court need not consider MDOC's other arguments against the application of 34 C.F.R. § 300.2 here.  *See* MDOC Opp'n at 8 ("Second, the inclusion of corrections facilities in 34 CFR 300.2[(b)](iv) signals that corrections facilities were specifically NOT included in 34 CFR 300.22, which Michigan did adopt by reference.  Under the time-honored maxim regarding statutory construction . . . inclusion by specific mention excludes all that is not mentioned.").

rather slender reed, given that (1) there is no strong reason to think that MDOC is *in*cluded in the MMSEA's coverage in the first place and (2) as discussed below, several School Code provisions tend to show that the Legislature did not contemplate state law requiring MDOC to play a role in providing special-education services.

Referring to the aforementioned statute requiring state government departments to operate special-education programs, MICH. COMP. LAWS § 380.1751(5), MPAS argues that under this provision, "departments of state government, which include MDOC, are obligated to provide those special education programs and services that are mandated under State law and those include the provision of services to students under the age of 27." MPAS MSJ at 7. But that too begs the question whether special-education services are "mandated under State law" for MDOC, when the MMSEA Rules themselves fail to clearly say so.

MPAS also points to a statutory provision that requires MDOC teachers to possess valid teaching certificates, MICH. COMP. LAWS § 380.1531a, as reflecting the Legislature's "capacity and willingness to address education provided to inmates . . . ." MPAs's MSJ at 7. But it is not enough for MPAS to show that the Legislature was able and willing to address the topic of education for inmates. MPAS must identify some clear statutory or regulatory authority for a court, especially a federal court, to force the taxpayers of Michigan specifically to fund the provision of *special-education services* to *additional inmates* under the MMSEA. MPAS has not identified such authority. *See generally Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 698 n.20 (Mich. 2005) (Corrigan, J., for the Court) (citing with approval a sister court's reference to "the virtue of judicial restraint"); *Nat'l Wildlife Fed'n v. Cleveland Cliffs Iron Co.*, 684 N.W.2d 800, 816 n.21 (Mich. 2004) (Markman, J., for the Court) (noting that "judicial restraint" has been "honored by judges

from time immemorial").

Perhaps most significant, a major definitional provision of the School Code *strongly* suggests that the Legislature did not contemplate requiring MDOC to provide adult special-education services beyond those required by federal law.  **The School Code's definition of special education programs and services nowhere mentions MDOC, instead specifying by name a host of other entities that are expected to render such services:**

> "Special education programs and services" means educational and training services designed for students with a disability and operated by *local school districts, local act school districts, intermediate school districts, the Michigan schools for the deaf and blind, the department of community health, the department of human services, or a combination of these*, and ancillary professional services for students with a disability rendered by agencies approved by the state board.  The programs shall include vocational training, but need not include academic programs of college or university level.

MICH. COMP. LAWS § 380.6(7) (emphasis added).  Absent a clear directive from the Legislature, it strains logic to believe that it required MDOC to provide special-education programs and services when the very definition of those services contemplates provision by numerous entities of the State and its subdivisions *but not MDOC*.

Finally, *amicus curiae* Michigan Department of Education correctly points out that MDOC is nowhere to be found in three School Code sections detailing the role, authority, and obligations of various governmental bodies in providing special-education services.  *See* Amicus Brief filed April 1, 2008 at 2-3.  These provisions of the Code conspicuously omit MDOC from mandatory interaction and cooperation with the Superintendent of Public Instruction, local school districts, and intermediate school districts in the special-education arena.  *See* MICH. COMP. LAWS § 380.1701(a) (directing the Superintendent to "[d]evelop, establish, and continually evaluate and modify *in*

-22-

*cooperation with intermediate school boards*, a state plan for special education which shall provide for delivery of special education programs and services.") (emphasis added); MICH. COMP. LAWS § 380.1711 (directing intermediate school district boards to "[d]evelop, establish, and continually evaluate and modify *in cooperation with its constituent districts*, a plan for special education . . . " and making no mention of cooperation with MDOC) (emphasis added); MICH. COMP. LAWS § 380.1751(1)(b) (in fulfilling out its responsibility for providing special education programs and services, a local school district may "[c]ontract with its intermediate school board, another intermediate school board, another local school district board, an adjacent school district board in a bordering state, the Michigan schools for the deaf and blind, the department of community health, the department of human services, or any combination thereof").[10]

### MDOC Contends that MPAS is Collaterally Estopped by a State-Court Decision, *Cain*

---

[10]

   In addition to arguments based on various statutes and regulations, MPAS expresses its view that requiring MDOC to provide the special-education services at issue here would be a wise and just policy, with practical benefits, whereas allowing some adult inmates to go without special-education services would do a disservice to both those inmates and the public interest. But it is a fundamental principle of our Republic that courts cannot be used to substitute litigants' "personal preferences of what governmental policy ought to be for the policies actually produced by the representative processes of government" *Nat'l Wildlife Fed'n v. Cleveland Cliffs Iron Co.*, 684 N.W.2d 800, 820 n.28 (Mich. 2004) (Markman, J., for the Court). As the Michigan Court of Appeals has emphatically stated,

> The wisdom of the principle of judicial restraint expressed by [the Michigan] Supreme Court is self-evident; the notion that our courts may precipitously intervene in the political arena and preempt a vote of the people is inconsistent with both the role of the courts and the principles of our democracy.

*Charter Twp. of Bloomfield v. Oakland Cty. Clerk*, 654 N.W.2d 610, 632 (Mich. App. 2002) (citing *Senior Accountants, Analysts & Appraisers Ass'n v. City of Detroit*, 553 N.W.2d 679, 683 (Mich. App. 1996)).

Alternatively, MDOC contends that it is entitled to judgment based on collateral estoppel. *See* MDOC's Opp'n at 9-10. Specifically, MDOC contends that MPAS should be collaterally estopped from arguing a position contrary to the holding of the Circuit Court for Ingham County in *Cain v. MDOC*, No. 88-61119-AZ. In *Cain*, a class of Michigan state prisoners argued that they were entitled to special-education services pursuant to the Michigan School Code.

The record of the instant case initially contained only two short orders from that case. By order dated June 21, 1993, the Honorable James R. Giddings partially granted and partially denied MDOC's motion for summary judgment. The order stated, in pertinent part, "the Defendant's Motion for Summary Disposition is granted as to Paragraph 62 of the Plaintiffs' Third Amended Complaint concerning the Michigan Mandatory Special Education Act. For the reason that [the] Act does not impose any specific duties upon the Michigan Department of Corrections." MDOC's Opp'n, Ex. 5. The *Cain* case was closed by order dated November 4, 2003, wherein Judge Giddings approved a settlement that covered *Cain* and two other cases. *See* MDOC's Opp'n, Ex. 6.

MPAS initially complained that the court cannot determine whether *Cain* meets the first two criteria for collateral estoppel because we do not know precisely what issue was presented, and what relief was sought, in Cain's claim ("Paragraph 62 of the Third Amended Complaint") on which the state court granted summary judgment to MDOC. *See* MPAS Reply at 4. MPAS was correct in this regard. Accordingly, by order issued April 9, 2008, this court ordered MDOC to file copies of the third amended complaint, the answer thereto, and summary-judgment briefs from *Cain*, in case the collateral-estoppel issue proved essential to a ruling. MDOC filed the *Cain* documents, and MPAS responded by arguing, *inter alia*, that it was neither a party to *Cain* nor in privity with a party and hence cannot be bound by it.

-24-

The disposition of the pending motions on the merits, however, obviates the need to address collateral-estoppel issues.   Any collateral estoppel effect of *Cain* would merely provide an additional, superfluous basis for the instant ruling.  *See* MDOC's Opp. at 9-10; MPAS's MSJ Reply at 4-5.

# Order

Having reviewed the third amended complaint and the defendant's answer thereto, the plaintiff's summary-judgment brief, the defendant's opposition brief, the plaintiff's reply brief, the *amicus curiae* brief of the Michigan Department of Education, and the defendant's reply brief:

Plaintiff's motion for partial summary judgment [#204] is **DENIED**.

Defendant's motion for partial summary judgment [#206] is **GRANTED.**

Plaintiff's claim under the Michigan Mandatory Special Education Act is **DISMISSED**.

This is not a final order, because it does not dispose of all issues as to all parties.

**IT IS SO ORDERED this 8th  day of October 2008.**

/s/ Paul L. Maloney_____
Honorable Paul L. Maloney
Chief United States District Judge